IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **SABRINA SIEGEL, CARLA HERVERT, FRED HERVERT, JUDITY GOLDSMITH, INGRID EDSTROM, CYNTHIA ALLEN, ELIZABETH DICKEY, DR. ANITA BROWNING, DENNIS HOERNER, WILLIAM ZWICKER, VICTOR ODLIVAK, ALISON PRICE, SOFIA DUMITRU, WANDA MECK, LISA-MARIE DIVINCENT, JAMIE WHITNEY, MELINDA STONE, MARSHALL SANDERS, BEKKI BRUCKNER, JOSHUA KORN, TAD PATTERSON, ALAN STEIN,** and **STAR GATE AWARENESS RESOURCE**,<br>　　　　Plaintiffs,<br><br>　　v.<br><br>**EUGENE WATER & ELECTRIC BOARD,** and **FRANK LAWSON**, in his personal capacity<br><br>　　　　Defendants. | Case No. 6:24-cv-00790-MK<br><br>ORDER AND OPINION |

**MCSHANE, Judge:**

Plaintiffs bring this action against a municipal utility and its manager. Plaintiffs seek a temporary restraining order ("TRO") which would prevent Defendants from replacing analog metering devices with digital smart meters and prohibit Defendants from shutting off the power to any customers who object to the smart meters. Second Mot. for Temporary Restraining Order ("TRO Mot.") 3, ECF No. 12. One group of plaintiffs (the "ADA Plaintiffs") seek relief under

1 – OPINION AND ORDER

Title III of the Americans with Disabilities Act ("ADA") and the Federal Fair Housing Amendments Act ("FFHA"), while a second group of plaintiffs (the "Avoiding Danger Plaintiffs") express concern about the privacy risks associated with smart meters and assert constitutional due process and tort claims.[1] *Id*. at 4, 5, 8. Because neither group of Plaintiffs have shown a likelihood of success on the merits, Plaintiffs' Motion is DENIED.

## BACKGROUND

Defendant Eugene Water & Electric Board ("EWEB") provides electricity and water to approximately 200,000 customers in the Eugene, Oregon metropolitan area. Am. Compl. ¶ 23, ECF No. 11. In 2013, Defendant approved a plan to substitute its traditional analog meters with digital "smart meters." Defs.' Resp. 14, ECF No. 14. According to Defendants, the electric metering is conducted for utility operational purposes only, including to accurately record a customer's cumulative electric usage. Rowe Decl. ¶ 5, ECF No. 19. Defendants also state they can configure the digital meters to not broadcast consumption information. Defs.' Resp. 15.

Plaintiffs are twenty-two[2] of Defendants' customers who object to the instillation of smart meters. On May 24, 2024, Plaintiffs filed this TRO requesting that the Court issue an order: (1) prohibiting Defendant from cutting power to any customer who wanted to retain their analog meter; (2) requiring Defendant to restore electric services to three plaintiffs who refuse to replace their analog meters with smart meters; (3) requiring Defendant to adjust the smart meter on the property of a plaintiff who had previously threatened to fight one of Defendants' employees; and (4) requiring Defendants to show cause why a preliminary injunction should not be entered. TRO

---

[1] It is not clear from the Amended Complaint and TRO Motion which plaintiffs fall into which group, or if individual plaintiffs can be part of both the ADA Plaintiffs and Avoiding Danger Plaintiffs groups.
[2] A twenty-third plaintiff, Star Gate Awareness Resources, is a bookstore owned by Plaintiff Stein, and similarly receives its power from Defendants.

2 – OPINION AND ORDER

Mot 3; *see also* Pls.' Reply 22, ECF No. 23. The Court reserved ruling on Plaintiffs' Motion until Defendants had an opportunity to respond. Scheduling Order, ECF No. 13.

## STANDARDS

The standard for a preliminary injunction is a high one: "it may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). A party seeking a preliminary injunction must establish four factors: "[(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Id*. at 20. The legal standards applicable to TRO's and preliminary injunctions are "substantially identical." *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n.7 (9thCir. 2001). A court cannot award a preliminary injunction based on a mere possibility of irreparable harm. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## DISCUSSION

### I. Plaintiffs' Motion is Substantively a Motion for Preliminary Injunction

As a threshold matter, the Court construes Plaintiffs' Motion for Temporary Restraining Order as a motion for preliminary injunction. While both forms of injunctive relief require courts to look the same factors in their analyses, TRO's and preliminary injunctions serve fundamentally different purposes. *See Stuhlbarg*, 240 F.3d at 839 n.7. "The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *See W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1008–09 (D. Or. 2009) (citations and quotations omitted) (cleaned up). On the other hand, "[t]he purpose of a preliminary injunction is to preserve the status

3 – OPINION AND ORDER

quo and the rights of the parties until a final judgment on the merits can be rendered[.]" *Arizona Recovery Hous. Ass'n v. Arizona Dep't of Health Servs.*, 462 F. Supp. 3d 990, 996 (D. Ariz. 2020).

The respective durations of TRO's and preliminary injunction support their distinctive functions. "Preliminary injunctions remain in force throughout the litigation, whereas provisional temporary restraining orders are traditionally more limited in time – 'restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary and no longer.'" *See Alliance for Wild Rockies v. Higgins*, 690 F. Supp. 3d 1177, 1186 (D. Idaho 2023) (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438–39 (1974)).

Plaintiffs' TRO Motion, despite its title, is substantively a request for a preliminary injunction. At various points in their Motion, Plaintiffs appear to request relief that would extend throughout litigation:

> "The Court should enter an order **for a broader temporary restraining order** and order EWEB t**o show cause why a preliminary injunction order should not be entered.** Specifically, the Court should enter a TRO that: (1) prohibits EWEB from cutting power to any customer who seeks to retain their analog meter . . ."
> ***
> "EWEB's behavior shows that a TRO protecting a single person is insufficient to deter EWEB from cutting off power of other similarly situated people. . . . EWEB did not get the hint that cutting off power to disabled people is inpermissible [*sic*]. Hence Plaintiffs request a temporary restraining order **prohibiting** EWEB from cutting off the power **for anyone** who wants to keep their analog meter."
> ***
> "EWEB's overall policy needs to be halted so that the Court can review it, without responding to emergencies **every week**."
> ***
> "What about EWEB's other customers who do not know about this case and who are receiving the same threats from EWEB? . . . **[T]he Court should issue a preliminary injunction prohibiting** EWEB from cutting off power to **any** customer on the grounds that they are refusing a smart meter."

TRO Mot. 3, 12, 13, 21 (emphasis added)

4 – OPINION AND ORDER

In its May 29, 2023 Order, the Court deferred ruling on Plaintiffs' Motion until it could consider Defendants' Response. Scheduling Order, ECF No. 13. Having received Defendants' Response, Plaintiffs' Motion is no longer *ex parte*—an element unique to TRO's but not to preliminary injunctions. *See* Fed. R. Civ. P. 65. Because the Court's review of TRO motions and preliminary injunction motions are substantially similar, the Court will construe Plaintiffs' Motion as a motion for preliminary injunction.

## II.     **The ADA Plaintiffs Have Not Shown a Likelihood of Success on the Merits**

The first factor under *Winter* requires Plaintiffs to demonstrate a likelihood of success on the merits. 555 U.S. at 20. Title II of the ADA prohibits disability discrimination as it relates to public services. The statute specifically provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under Title II, "[a] public entity shall make reasonable accommodations to policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of a disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 § C.F.R. 35.130(b)(7)(i).

To succeed on a Title II claim, a plaintiff must show that: (1) he is a qualified individual with a disability, (2) he was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of his disability. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). The "failure to provide [a] reasonable accommodation can constitute discrimination." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 951 (9th Cir. 2017) (cleaned up). However, the ADA does not

5 – OPINION AND ORDER

mandate that a public entity fulfill every accommodation requested by a disabled individual; instead, it only mandates reasonable accommodations. *See Selene v. Legislature of Idaho*, 514 F. Supp. 3d 1243, 1256 (D. Idaho 2021) (citing *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002)).

Immediately, the first element is at issue; i.e., whether the ADA Plaintiffs are qualified individuals with a disability. Under the ADA, the term "disability" means (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102.[3] The ADA Plaintiff allege that their hypersensitivity to electromagnetic radiation qualifies them as disabled under both the ADA and the FHAA. *See* TRO Mot. 6. However, courts have repeatedly disagreed, finding that electromagnetic sensitive is not a cognizable disability under those laws. *See e.g. Barcello v. Welch*, No. 1:23-CV-137-MOC-WCM, 2023 WL 6307309, at *4 (W.D.N.C. Sept. 27, 2023); *Hirmiz v. New Harrison Hotel Corp.*, 865 F.3d 475, 476 (7th Cir. 2017); *G v. Fay Sch., Inc. by & through its Bd. of Trustees*, 282 F. Supp. 3d 381, 396–97 (D. Mass. 2017).

Plaintiffs bear the burden of demonstrating a qualifying disability, yet they instead ask the Court to accept conclusory statements asserting the existence of a disability. *See* Am. Compl. ¶ 42 ("Other Plaintiffs also suffer impairment of major life activities similar to Siegel."). And while the TRO Motion states that "[t]he ADA Plaintiffs have a handicap[,]" the Court is unpersuaded.

The ADA Plaintiffs have also failed to establish the third element of their ADA claims—a causal connection between the smart meters and their asserted disabilities. As Defendants point

---

[3] The definition of "handicap" under the FHAA is substantially identical to the definition of "disability" under the ADA. *See* 42 U.S.C. § 3602(h).

out, the ADA Plaintiffs only state a "concern for the *possibility* that an unspecified effect *may result* if a transmitting digital meter is placed on their homes[.]" Defs.' Resp. 11 (emphasis in original). The Court agrees with Plaintiffs that "[a]ccommodation under the disability statutes is not a one-size-fits-all answer." TRO Mot. 7. But as the Supreme Court held in *Winter*, "[a] preliminary injunction is an *extraordinary remedy never awarded as of right*." 555 U.S. at 24. Even assuming the ADA Plaintiffs could establish that they each have a qualified disability, the Court is not prepared to issue preliminary injunctive relief based on mere speculation. As this is not a decision on the merits, Plaintiffs will have the opportunity to supplement and complete the record during the discovery process.

### III.  The Avoiding Danger Plaintiffs Have Not Shown a Likelihood of Success on the Merits

The Avoiding Danger Plaintiffs similarly fail to demonstrate a likelihood of success on the merits. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment's Due Process Clause "specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (internal quotations and citations omitted).

The Court understands the Avoid Danger Plaintiffs' claims to be based on their asserted right to privacy. *See* Am. Compl. ¶ 52 ("Through Smart Meters, utility companies and all their partners will be inside everyone's home, constantly observing, evaluating, and recording individuals and their families, what they're using and doing. [*sic*] It is as if EWEB installed video

7 – OPINION AND ORDER

cameras in every room of every building, watching and recording, down to the 'bad flapper valve in the toilet.'") But before the Avoiding Danger Plaintiffs can assert that their privacy rights have been violated, they need to have interests protected by the Constitution.

"The Supreme Court has recognized that one aspect of the liberty protected by the Due Process Clause of the Fourteenth Amendment is a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1222 (9th Cir. 2020) (internal quotations marks and citations omitted). "This right includes at least two constitutionally protected privacy interests: the right to control the disclosure of sensitive information and the right to independence [in] making certain kinds of important decisions." *Id.* (quotation marks omitted).

It is well-settled that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties. *See United States v. Mayer*, 503 F.3d 740, 750 (9th Cir. 2007) (citing *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979)). Courts have repeatedly found that utility records—and specifically power records—do not contain information in which individuals possess a reasonable expectation of privacy. *See e.g. United States v. Hamilton*, 434 F. Supp. 2d 974, 979–80 (D. Or. 2006); *Booker v. Dominion Virginia Pwr.*, No. 3:09-cv-759, 2010 WL 1848474, at *5 (E.D. Va. May 7, 2010).

The Avoiding Danger Plaintiffs point to *Naperville Smart Meter Awareness v. City of Naperville*, a recent case in which the Seventh Circuit held that a city's collection of energy-consumption data constituted a search. 900 F.3d 521, 527 (7th Cir. 2018); TRO Mot. 18. Using *Naperville*, the Avoiding Danger Plaintiffs contend that they do not "assume the risk of near constant monitoring by choosing to have electricity in [their] home[s]." TRO Mot. 18. But *Naperville* actually weakens Plaintiffs' argument, as the *Naperville* court would conclude—in the very next section—that the data collection at issue was reasonable:

8 – OPINION AND ORDER

> Of course, even a lessened privacy interest must be weighed against the government's interest in the data collection. That interest is substantial in this case. Indeed, the modernization of the electrical grid is a priority for both Naperville and the Federal Government.
>
> Smart meters play a crucial role in this transition. For instance, they allow utilities to restore service more quickly when power goes out precisely because they provide energy-consumption data at regular intervals. The meters also permit utilities to offer time-based pricing, an innovation which reduces strain on the grid by encouraging consumers to shift usage away from peak demand periods. In addition, smart meters reduce utilities' labor costs because home visits are needed less frequently.
>
> With these benefits stacked together, the government's interest in smart meters is significant. Smart meters allow utilities to reduce costs, provide cheaper power to consumers, encourage energy efficiency, and increase grid stability. We hold that these interests render the city's search reasonable, where the search is unrelated to law enforcement, is minimally invasive, and presents little risk of corollary criminal consequences.

*Id*. at 528–29.

Plaintiffs have not provided—and the Court was unable to find—any caselaw recognizing the Avoiding Danger Plaintiffs' purported right to privacy concerning electrical usage records. Finding no reason to break from clearly established precedent, the Court will not judicially create a new privacy interest. The Court is not convinced that the Avoiding Danger Plaintiffs' can present a meritorious claim without a constitutionally protected right to be violated.

## **CONCLUSION**

Because neither group of Plaintiffs have shown a likelihood of success on the merits, Plaintiffs' Motion (ECF No. 12) is DENIED.

IT IS SO ORDERED.

DATED this 30th day of July, 2024.

                                                                                               /s/ Michael J. McShane
                                                                                                Michael McShane
                                                                          United States District Judge